1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MIGUEL ESTRADA, | ) | 1:06-cv-1370 LJO GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PLAINTIFF'S |
| v. | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACKGROUND

Plaintiff Miguel Estrada ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge, for findings and recommendation to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

In September 2003, Plaintiff filed an application for SSI and disability insurance benefits. AR 67-70, 266  He alleged disability since April 1, 2003, due to polio in the right leg and

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

anxiety. AR 43, 67-70. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 43-47, 50-55, 56-57. On February 2, 2006, ALJ Michael Haubner held a hearing. AR 269-309. ALJ Haubner denied benefits on April 11, 2006. AR 10-23. On August 3, 2006, the Appeals Council denied review. AR 5-7.

Hearing Testimony

On February 2, 2006, ALJ Haubner held a hearing in Fresno, California. AR 269-309. Plaintiff appeared with his attorney, Robert Ishikawa. AR 271. Vocational expert ("VE") Jose Chaparro also appeared and testified. AR 271, 294-304.

Plaintiff was born on July 5, 1970. AR 276. He completed the twelfth grade, but has not had any other formalized education or training. AR 276.

Plaintiff testified that he last worked on or about March 1, 2003. AR 276. Between the years 1992 and 1993, he worked as a machine operator in a packing house. AR 276-277. The machine he operated sealed the boxes, printed the dates and counted the boxes. AR 277. Plaintiff had to lift the boxes. AR 277. He would lift about 50 pounds at one time. AR 277. He was lifting that amount most of the day. AR 277.

In 1995, Plaintiff worked for the City of Orange through an unemployment program. AR 277-278. He essentially was a laborer, pulling weeds and using shovels and backhoes. AR 278. Between 1997 and 2000, Plaintiff worked as a painter. AR 278. He painted scissor lifts with an air gun. AR 278-279. Plaintiff later testified that between the years 1992 and 1993, he worked stocking shelves at a market. AR 279. In 2000, he worked at the receiving and packing house. AR 279. He made tags for receiving the trucks of fruit. AR 280. In that job, he lifted tags, which weighed under 10 pounds. AR 280.

Plaintiff reported that he has not looked for work since he applied for Social Security. AR 280. He looked for work right before he filed his application in September 2003. AR 281.

Plaintiff testified that the last time he had any alcohol was 1997. AR 282. The last time he had any street drugs or recreational drugs was 1996. AR 282. He smokes a pack of cigarettes

a day.  AR 282.  He has been at that level since 1984.  AR 282.  The doctors first told him to quit smoking about a year prior to the hearing.  AR 282.

Plaintiff has never been convicted of a crime.  AR 283.  He was arrested in 1992 for a DUI.  AR 283.  He also was arrested for not paying traffic tickets.  AR 283.

Plaintiff testified that he lives with his wife and four kids.  AR 283.  At the time of the hearing, his youngest children were 10-month-old twins.  AR 283.  He also had a five-year-old daughter and a seven-year-old son.  AR 283.  His wife works outside the home.  AR 283.  She works 30 hours per week, Monday through Thursday from 4:00 p.m. to 8:00 p.m, Saturdays from 2:00 p.m. to 8:00 p.m., and on Sundays it varies.  AR 284.  She has Fridays off.  AR 284.  When she is working, Plaintiff is home with the kids.  AR 284.  His mom comes over half the time to help him with the kids.  AR 284-285.

Plaintiff testified that he does not have a driver's license.  AR 285.  The last time he had a driver's license was in 1992.  AR 285.  It was suspended because of the DUI.  AR 285.  He does not drive.  AR 285.  The last time he drove was about two months before the hearing and about six months before the hearing.  AR 285.  He drives every three or four months.  AR 286.  The car he drives is an automatic van.  AR 286.

Plaintiff testified that he is able to take care of his own personal needs, shave, brush his teeth, dress, shower or bathe, feed himself and comb his hair.  AR 286.  He does not cook or prepare meals.  AR 286.  He makes simple meals about twice a day.  AR 286.  He cleans up after himself and does dishes twice a day.  AR 287.  He shops or goes to the market once a day.  AR 287.  Plaintiff reported that he goes to church every Sunday.  AR 287.  The congregation alternates sitting and standing.  AR 287.  They kneel once during the service.  AR 287.  Plaintiff does not kneel with the congregation.  AR 287.  He just sits and stands.  AR 287.  In the morning, he goes to bible study for an hour.  AR 287.  Then he takes a 20-minute break.  AR 288.  He is in church for four hours, which includes the bible study and the service.  AR 288.  The longest he is in church without a break is three hours.  AR 288.

Plaintiff testified that he lives in an apartment.  AR 288.  He does not have to do any yard work.  AR 288.  He does chores inside the house.  AR 288.  He sweeps every three days and

vacuums once a week.  AR 288.  He takes out the trash every two days.  AR 288-289.  He does not clean the kitchen or the bathrooms.  AR 289.  He mops the floor twice a week.  AR 289.  He does not wash the windows.  AR 289.  He makes his bed every day.  AR 289.  He does laundry once a week.  AR 289.  He does not iron.  AR 289.  He does not have a computer at home.  AR 289.  He watches TV five hours a day.  AR 289-290.  He does not read the newspaper or magazines.  AR 290.  He knows how to read and can write more than his name.  AR 290.  He talks on the telephone once a day.  AR 290.  He has a checking account.  AR 290.

Plaintiff testified that his son and his daughter are in school AR 290.  He drives them to school every day and picks them up.  AR 290-291.

Plaintiff reported that he is compliant with all his treatment and medications.  AR 291.  He can lift and carry twenty pounds.  AR 291.  He can be on his feet for forty-five minutes before he needs to sit down and rest.  AR 291.  He can walk a block.  AR 291.  He has a stick cane that was prescribed by Dr. Malwoledik (phonetic) about a year prior to the hearing.  AR 291-292.  He uses it about 50 percent of the time.  AR 292.  He does not use it in the house, just when he goes outside.  AR 292.

Plaintiff testified that he has pain in the knees and legs.  AR 292.  It is constant.  AR 292.  On a scale of 1 to 10, he would rate his pain as a 9.  AR 292-293.  He has not been to the emergency room in the last three years.  AR 293.  He has to lie down because of pain or fatigue about once a day for about an hour.  AR 294.

Plaintiff indicated that the longest he can pay attention to things before his minds starts to wander is about five minutes.  AR 293.

The VE also testified.  AR 294-295.  He was present during the course of the hearing and had an opportunity to review the work history exhibits.  AR 295.  The VE asked how long Plaintiff worked as a stock clerk.  AR 296.  Plaintiff testified he worked as a stock clerk for a year in a grocery store.  AR 296.  He was lifting 40 pounds for six hours out of an eight hour day.  AR 296.

1    The VE testified that Plaintiff's work as a machine packager was unskilled, medium

2    work.  AR 296.  As written in the exhibits, Plaintiff performed it as heavy work.  AR 296.

3    Plaintiff's work as a weeder-thinner was unskilled, medium work.  AR 296.

4    Plaintiff testified that his work as a paint sprayer was at a manufacturing company.  AR

5    297.  It would take someone 30 to 60 days to learn how to paint scissor lifts.  AR 297.  The VE

6    testified that this work appeared to be spray painter one, which is semi-skilled, medium work.

7    AR 297.  Plaintiff's work as a retail stock clerk was performed as heavy, unskilled work, which

8    was consistent with the DOT.  AR 297-298.

9    The VE testified that Plaintiff would have obtained skills in his past relevant work

10   following instructions on how to stock, product knowledge, how to operate the spray painting

11   machinery and equipment and following detailed instructions.  AR 298.   The VE testified that

12   those skills would transfer only to similar occupations.  AR 299.

13   For the hypotheticals, the ALJ asked the VE to assume a person of the same age,

14   education, language, experience and background as Plaintiff.  AR 299.  For the first hypothetical,

15   the ALJ asked the VE to assume a person who could not lift over 70 pounds on a frequent basis.

16   AR 299.  The VE testified that this person could do Plaintiff's past relevant with the exception of

17   stock clerk.  AR 299.  In the alternative, this person could do other work as it generally occurred.

18   AR 299.  This person could do medium and medium, light, and sedentary unskilled work.  AR

19   299.  Sedentary through medium work would be open to the person in hypothetical one.  AR

20   299-300.  The grid rules for those exertional levels would apply.  AR 300.

21   For the second hypothetical, the ALJ asked the VE to assume a person who could lift and

22   carry 70 pounds occasionally, 25 pounds frequently, could stand or walk about 6 hours out of 8,

23   could sit about 6 hours out of 8 and could push and pull "unlimited."  AR 300.  The VE testified

24   that this person could do Plaintiff's past relevant work except for stock clerk.  AR 300.  This

25   person could perform the world of sedentary through medium unskilled work.  AR 300-301.

26   For the third hypothetical, the ALJ asked the VE to assume a person limited to simple

27   repetitive tasking, one to two-step tasks.  AR 301.  The VE testified that this person could

28   perform the machine packager and the weeder/thinner work.  AR 301.  For hypothetical three A,

1  combining hypothetical one with hypothetical three, the person could do the weeder and machine

2  packer work and the world of unskilled sedentary through medium work.  AR 301.  The grid

3  numbers would apply.  AR 301.

4       For hypothetical four, the ALJ asked the VE to assume a person who is moderately

5  limited in the ability to understand and remember detailed instructions and moderately limited in

6  the ability to carry out detailed instructions.  AR 301.  The VE testified that this person could do

7  Plaintiff's past relevant work as weeder/thinner and machine packager.  AR 301.  As for other

8  work, this person could perform the world of unskilled work at all exertional levels.  AR 301-

9  302.  The grid numbers again would apply.  AR 302.

10       For hypothetical five, the ALJ asked the VE to assume a person who was restricted from

11  heavy lifting, repetitive bending, stooping, kneeling, squatting, climbing, pushing or pulling.  AR

12  302.  This person could not do any past relevant work that Plaintiff did.  AR 302.  This person

13  could do other generally appearing unskilled work.  AR 302.  One example would be mail clerk,

14  which is light and unskilled, with 1,300 jobs in California and 13,000 in the nation.  AR 302.

15  Another example is ticket seller, which is light and unskilled, with 15,000 jobs in California and

16  about 150,000 jobs in the nation.  AR 303.  Another example is cashier II, which is light and

17  unskilled, with about 23,000 jobs in California and about 230,000 jobs in the nation.  AR 303.

18       For hypothetical six, the ALJ asked the VE to assume a person who could lift and carry

19  15 pounds occasionally, but could not lift frequently.  AR 303.  This person could stand and walk

20  1 hour out of 8 for 10 to 15 minutes at a time without interruption and could sit for 3 hours

21  without interruption for a total of 3 hours out of 8.  AR 303.  This person should avoid climbing,

22  stooping, kneeling, balancing, crouching, crawling, reaching and handling.  AR 303.  The VE

23  testified that this person could not do Plaintiff's past relevant work.  AR 303.  There was no

24  other generally appearing work that the hypothetical person could do.  AR 303.

25       For hypothetical seven, the ALJ asked the VE to assume a person who could lift and carry

26  20 pounds, could stand 45 minutes at a time and could walk one block at a time.  AR 303-304.

27  This person uses a cane 50 percent of the time, but always uses it when he goes out.  AR 304.

28  This person could concentrate in five-minute increments and needed a one hour unscheduled

break per day.  AR 304.  The VE testified that this person could not do Plaintiff's past relevant work or any other work as it generally appeared.  AR 304.

In response to questions from his legal counsel, Plaintiff testified that his right leg is smaller than his left leg.  AR 304.  He falls frequently--twice a day.  AR 304.  This has been occurring for about a year.  AR 305.  When Plaintiff stopped work, he was falling at work.  AR 305.  He would fall three or four times a day at work because of his leg.  AR 305.  His leg gets tired and "gives up."  AR 305.  When that happens, he cannot work.  AR 305.  He loses all muscle control.  AR 305.

Plaintiff testified that he has weakness and pain in his left leg every day.  AR 305.  He has medication to relieve it.  AR 305.  He does not have any side effects from the medication.  AR 305.  Plaintiff also testified that he has problems with his right hand.  AR 305.  He tore four tendons in his right hand and had surgery on it two years prior to the hearing.  AR 306.  He did not gain his range of motion or his strength.  AR 306.  He has problems grasping large and small objects with his right hand.  AR 306.  He testified that he did not have problems grasping a pen with his right hand, writing or grasping a coffee cup.  AR 306-307.  He has problems with grocery bags, objects and moving couches.  AR 307.  He does not move couches.  AR 307.  He has problems lifting large objects with his right hand.  AR 307.  The heaviest thing he could lift with his right hand is fifteen or twenty pounds.  AR 307.

Plaintiff testified that the longest he could sit at one time before he had to get up and move was one hour.  AR 306.  Plaintiff testified that he worked 14, 15-hour shifts at a juice company.  AR 308.  He worked there only for a month, because his co-workers were complaining that they were doing more of the work.  AR 308.  He could not perform the job because of his leg.  AR 308.  The foreman and the supervisor switched him to another line and then they let him go.  AR 308.  He had frequent falls and that was another reason they let him go.  AR 308.

In the packing house, Plaintiff worked receiving.  AR 308.  When he went back the following year, the supervisor did not want to give him his job back due to the two falls that he had while working there.  AR 308.  He had to keep walking up and down some stairs and he fell.

1    AR 308.  They did not want to give him his job back.  AR 308.  At the packing house, it is

2    working 12 or 13 hours, standing in one spot, and it was too overwhelming and too hard on his

3    leg.  AR 308.  At the other company, he had an injury, but the work was too hard on his back and

4    his leg.  AR 308.  It was too much heavy lifting besides painting.  AR 308.  Plaintiff testified that

5    it is really stressful.  AR 309.

6         Medical Evidence

7         On February 20, 2001, Dr. Daniel Brubaker, D.O., completed a form for the State

8    regarding examination of Plaintiff.  AR 175.  Plaintiff reported that he fell at work on January 25,

9    2001, and complained of low back and hip pain.  AR 175.  On examination, Plaintiff had pain on

10   palpation of gluteals, lumbar facets and IL joint.  AR 175.  Dr. Brubaker diagnosed Plaintiff with

11   sacroiliac sprain: "R/O Disc vs Compression Sacral Fx."  AR 175.  Plaintiff was prescribed

12   Celebrex, Vicodin and a Medrol pak.  An MRI was scheduled.  AR 175.

13        On February 23, 2001, Dr. Brubaker completed a consultation with Plaintiff for Travelers

14   Property Casualty.  AR 171-174.  The purpose of the consultation was to determine if Plaintiff

15   needed further treatment for injuries sustained on January 25, 2001.  AR 171.  Plaintiff

16   complained to Dr. Brubaker of low back pain, upper back pain and hip pain.  AR 171.  Plaintiff

17   reported that on January 25, 2001, he was walking while carrying a load and slipped and fell on

18   his buttocks.  AR 171.  Although he continued to work, the following day he suffered from

19   severe pain in his low back and gluteal region.  AR 171.  Plaintiff also reported that he went to

20   physical therapy three times a week for one to two weeks and was undergoing therapy at the time

21   of the consultation.  AR 172.

22        Following a physical examination of Plaintiff's back and hips, Dr. Brubaker indicated

23   that pain was elicited on palpation across the posterior superior iliac spines and crest, sacrum and

24   gluteal region.  AR 174.  Dr. Brubaker diagnosed Plaintiff with sacroiliac sprain with rule out

25   lumbar discs or compression fractures of the sacrum.  AR 174.  Dr. Brubaker opined that

26   Plaintiff remained temporarily totally disabled.  AR 174.  Dr. Brubaker prescribed a Medrol

27   Dose-Pak and Valium.  Plaintiff was scheduled for an MRI.  AR 174.

28

On February 28, 2001, Plaintiff underwent an MRI of the lumbrosacral spine.  AR 166-167.  Dr. Matthew M. Iwamoto, M.D., opined that Plaintiff had an unremarkable MRI of the lumbosacral spine with no evidence of disc bulge or protrusion.  AR 167.  There was no evidence of facet joint arthropathy.  AR 167.

On February 28, 2001, Plaintiff also underwent MRIs of the cervical spine and the thoracic spine.  AR 168-169, 170.  In connection with the cervical spine, Dr. Iwamoto opined that Plaintiff had small bulges at the levels of C4-5 and C6-7 with no evidence of gross central canal stenosis or cord compression.  AR 169.  There was no evidence of gross neural foraminal stenosis at any level.  AR 169.  With regard to Plaintiff's thoracic spine, Dr. Iwamoto opined that the MRI was unremarkable.  AR 170.

On March 13, 2001, Dr. Brubaker examined Plaintiff and completed a Primary Treating Physician's Progress Report form ("Progress Report") for the State Division of Workers' Compensation.  AR 165.  Dr. Brubaker opined that Plaintiff's condition had improved, but more slowly than expected.  AR 165.  Dr. Brubaker diagnosed Plaintiff with lumbar sprain/strain, thoracic obliques spasm and S1 sprain.  AR 165.  Plaintiff's current medications were listed as Vioxx, SOMA and Darvocet.  AR 165.  Dr. Brubaker opined that Plaintiff was temporary totally disabled.  AR 165.

On April 24, 2001, Dana Reed, MPT, of the Physical Therapy Department at Sierra Kings District Hospital prepared a discharge report regarding Plaintiff.  AR 177.  MPT Reed reported that, despite a variety of treatment, Plaintiff had progressed very little both subjectively and objectively over the course of 8 physical therapy visits for muscle strain/lumbar strain/sprain.  AR 177.  MPT Reed opined that Plaintiff was at high risk for back re-injury as he was unable to lift heavy boxes using proper body mechanics secondary to weak right hip extensors, hamstrings and quadriceps.  AR 177.  MPT Reed discharged Plaintiff from physical therapy and recommended job retraining.  AR 177.

On April 27, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.  AR 164.  Plaintiff complained of muscle spasms in the left and right hip and weakness in his legs.  AR 164.  On examination, Plaintiff had muscle spasm in the right lateral oblique and

1  "gluteal max." AR 164. Dr. Brubaker diagnosed Plaintiff with lumbar strain and gluteal and

2  oblique spasm. AR 164. Plaintiff was restricted from any lifting. AR 264. Dr. Brubaker

3  requested vocational rehabilitation and opined that Plaintiff was temporary totally disabled. AR

4  164.

5       On May 18, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.

6  AR 163. Dr. Brubaker diagnosed Plaintiff with erector spinal tendinitis and opined that

7  Plaintiff's condition remained the same and he as temporary totally disabled. AR 163.

8       On June 5, 2001, Igor Jercinovich, M.D., a Diplomate of the American Board of

9  Orthopaedic Surgery and qualified medical examiner completed an orthopaedic evaluation for

10 workers' compensation purposes. AR 148-157. Dr. Jercinovich indicated that Plaintiff sustained

11 a slip-and-fall injury to his low back on January 25, 2001, while working in a paint shop. AR

12 150, 155. Plaintiff complained of constant daily pain in his low back radiating toward the right

13 hip, which was aggravated by lifting activities. AR 150. Plaintiff reported that he was able to lift

14 a grocery bag comfortably, which is about 10 pounds, and could lift up to 30 pounds with pain.

15 AR 150. Plaintiff further reported that bending, stooping, pushing or pulling activities

16 aggravated his symptoms. AR 150.

17      On orthopaedic examination, Plaintiff ambulated with an antalgic gait and used no

18 external equipment, he was unable to heel and toe walk secondary to the right lower extremity

19 weakness from pre-existing polio residuals. AR 153. Examination of the lumbar spine revealed

20 tenderness to palpation in the paraspinal musculature. AR 153. Straight leg raise testing and

21 Fabere's were negative bilaterally. AR 153. Plaintiff was unable to straight leg raise the right

22 lower extremity. AR 154. Dr. Jercinovich diagnosed Plaintiff with chronic lumbar strain and

23 chronic right lower extremity atrophy and weakness secondary to polio residual. AR 154. Dr.

24 Jercinovich further opined that Plaintiff's condition was permanent and stationary and he should

25 be restricted from heavy lifting, repetitive bending, stooping, kneeling, squatting, climbing,

26 pushing or pulling activities. AR 155. Dr. Jercinovich concluded that Plaintiff was unable to

27 return to his prior occupation and was considered an injured worker. AR 155. Vocational

28 rehabilitation was indicated. AR 155.

1

2          On May 24, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.

3    AR 162.  Dr. Brubaker opined that Plaintiff's condition had worsened.  AR 162.  Plaintiff was

4    diagnosed with erector spinal spasms and facet arthropathy.  AR 162. Dr. Brubaker requested

5    authorization for six injections.  AR 162.

6          On June 5, 2001, Dr. Jercinovich completed a Qualified or Agreed Medical Evaluator's

7    Findings Summary Form for the Department of Industrial Relations.  AR 158.  Dr. Jercinovich

8    opined that Plaintiff had a permanent disability, his medical condition was stable and not likely

9    to improve with active medical or surgical treatment, work caused or contributed to the injury or

10   illness, apportionment was not warranted, and there was a need for current or future medical care.

11   AR 158.  Dr. Jercinovich indicated that there were subjective complaints, but no relevant

12   diagnostic test results.  AR 158.  Dr. Jercinovich diagnosed Plaintiff with chronic lumbar strain

13   and chronic right lower extremity atrophy and weakness secondary to polio residual.  AR 158.

14          On June 15, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.

15   AR 161.  Dr. Brubaker opined that Plaintiff had improved with injections.  AR 161.  Plaintiff

16   was diagnosed with facet arthropathy and "SI joint pain."  AR 161.

17          On July 6, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.  AR

18   160.  Dr. Brubaker indicated that Plaintiff had some pain.  AR 160.  Plaintiff also had

19   improvement with the last injections, which lasted for two weeks.  AR 160.  Dr. Brubaker

20   diagnosed facet arthropathy and S1 joint pain.  AR 160.

21          On August 2, 2001, Dr. Brubaker examined Plaintiff and completed a Progress Report.

22   AR 159.  Dr. Brubaker reported that Plaintiff "had even more improvement with the last set of

23   injections."  AR 159.  Dr. Brubaker believed that Plaintiff would improve even more with

24   fleuroscopic guided procedures.  AR 159.  Dr. Brubaker diagnosed Plaintiff with facet

25   arthropathy and S1 joint pain.  AR 159.

26          On June 12, 2003, Plaintiff sought treatment at Sierra Kings Family Health Center for

27   depression follow-up and his right leg giving out.  AR 252.  Plaintiff complained of falls or near

28   falls due to his right knee giving out. AR 252.  On physical examination, Plaintiff's right thigh

and calf were atrophied.  AR 252.  Knee extension was very weak.  AR 252.  Plaintiff' right foot

plantar flexion also was very weak.  AR 252.  The provider diagnosed Plaintiff with anxiety and

post polio myelitis syndrome.  AR 252.  The provider also noted that Plaintiff had increasing

right leg weakness and knee instability.  AR 252.

On July 28, 2003, Plaintiff sought treatment at Sierra Kings Family Health Center for

recurring lower back pain.  AR 249-250.  The provider noted that Plaintiff found a new job

stacking boxes (palleting), which increased his leg weakness.  AR 250.  Plaintiff was moved to

stacking 6 packs of juice, but was "still very weak" after 6 hours.  AR 250.  Plaintiff was

diagnosed with post polio myelitis syndrome, with a week leg and atrophying muscle.  AR 250.

The provider noted that Plaintiff's depression/anxiety was improved.  AR 250.

On August 28, 2003, Melvin J. Dueck, F.N.P, at Sierra Kings District Hospital prepared a

letter to the Social Security Department regarding Plaintiff.  AR 176.  Nurse Dueck reported that

Plaintiff had chronic worsening of Post-Poliomyelitis Syndrome.  AR 176.  Plaintiff had periodic

falls due to leg weakness and Plaintiff's recent work stacking boxes exacerbated his weakness.

AR 176.  Nurse Dueck indicated that Plaintiff had great difficulty trying not to fall, especially

after 4 or more hours of physical labor.  AR 176.  Nurse Dueck opined that the phenomenon of

"worsening of peripheral muscular weakness in individuals who formerly had suffered polio is

very real."  AR 176.  Plaintiff was referred to a neurologist for further evaluation.  AR 176.

Nurse Dueck estimated that Plaintiff's physical limitations included no climbing ladders/stairs

and no activities that required balancing, stooping, crouching or kneeling.  AR 176.  Nurse

Dueck further reported that Plaintiff's lower extremity weakness was "clearly noticeable" on

exam and there was "obvious muscle atrophy present in his legs."  AR 176.

On September 9, 2003, Plaintiff sought treatment at Sierra Kings Family Health Center

for a right shoe lift.  AR 247.  Plaintiff reported a recent prospective employer had jobs that

required steel-toed boots, but that the added weight of those types of shoes increased his

difficulty lifting his right leg.  AR 247.  Plaintiff complained of increased right leg fatigue and

falling.  AR 247.  The provider diagnosed Plaintiff with post-poliomyelitis syndrome and leg

length discrepancy.  AR 247.  Plaintiff was directed to keep his neurology appointment.  AR 247.

On September 23, 2003, neurologist Mythili Sundaresan, M.D., completed a neurologic examination of Plaintiff. AR 189-190. Dr. Sundaresan noted that Plaintiff began using a cane in April 2003. AR 189. On neurological examination, Plaintiff's cranial nerves, two through twelve, were within normal limits. AR 190. On examination of the motor system, Plaintiff had weakness bilaterally in the supraspinatus, triceps, bilaterally in the infraspinatus, right more than left. AR 190. In the lower extremities, Plaintiff had placid paresis of the right leg and the right leg muscles were atrophied compared to the left leg. AR 190. Plaintiff had a right foot drop and weakness in the right leg. AR 190. Plaintiff seemed to have no problem standing, but walked with a limp because of the foot drop. AR 190. Plaintiff had scoliosis of the thoracic spine. AR 190. Dr. Sundaresan indicated the following had to be considered in Plaintiff: (1) Post Polio Syndrome, (2) Lumbosacral Stenosis, (3) Lumbosacral Radiculoneuropathy and/or Plexopathy; (4) Bilateral C5, C6 root lesion; (5) Mononeueropathy Multiplex of the upper and lower extremities. AR 190. Dr. Sundaresan opined that the findings in Plaintiff's legs seemed to be old and it was "difficult to say how much of a psychological overlay" was present. AR 190. Dr. Sundaresan requested an EMG/NCV of the upper and lower extremities, X-rays of the cervical spine and the lumbosacral spine and blood work. AR 190.

On September 26, 2003, Plaintiff underwent radiographic imaging of his lumbar spine. AR 188. Four views were obtained with no definite abnormality seen. AR 188. On that same date, a cervical spine series showed no abnormalities. AR 191.

On November 6, 2003, Dr. Sundaresan completed a nerve conduction report and concluded that Plaintiff had bilateral lumbosacral plexopathy, bilateral L4, L5 and S1 root lesion and mononeuropathy multiplex of the lower extremities. AR 186-187.

On February 10, 2004, Plaintiff sought treatment at Sierra Kings Family Health Center. AR 246. A notation on the record indicates that Plaintiff was working per diem (substitute) janitorial services. AR 246. Plaintiff reported he could not squat. AR 246. On physical examination, Plaintiff was diagnosed with anxiety-depression, post-polio myelitis syndrome, tobacco use and an enlarged, rigid liver. AR 246. Plaintiff was prescribed medication and directed to follow-up for lab results. AR 246.

On February 17, 2004, Plaintiff sought treatment at Sierra Kings Family Health Center for complaints of depression.  AR 245.  The provider noted that Plaintiff used tobacco, probably had a fatty liver and had post-polio myelitis weakness.  AR 245.  Plaintiff was taking Paxil.  AR 245.

On February 23, 2004, Samuel B. Rush, M.D., completed an orthopedic evaluation of Plaintiff for the Department of Social Services.  AR 192-194.  Plaintiff reported to Dr. Rush that he felt he could return to work and he was "fairly active" at home.  AR 192.  On orthopedic testing, Plaintiff's upper extremities, cervical spine, lumbar spine and left lower extremity were all normal.  AR 193.  His gait was slightly abnormal with a mild limp.  AR 193.  Plaintiff's balance was normal, Romberg test was negative and the remainder of his neurological examination was normal.  AR 193.  Dr. Rush concluded that Plaintiff had polio as a young man with right lower extremity atrophy, but was well compensated for it.  AR 194.  Dr. Rush opined that Plaintiff had no specific orthopedic limitations, but "[p]erhaps he should not lift over 70 pounds on a frequent basis."  AR 194.  He could use both hands for simple grasping, pushing and pulling.  AR 194.

On March 15, 2004, state agency physician James B. Peery, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 223-230.  Dr. Peery opined that Plaintiff could lift and/or carry 50 to 70 pounds occasionally, 25 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  AR 224.  He could push and/or pull without limitation other than as shown for lift and/or carry.  AR 224.  He did not have postural, manipulative, visual, communicative or environmental limitations.  AR 225-227.  On November 2, 2004, Alfred Torre, M.D., reviewed and affirmed the assessment as written.  AR 230.

On April 2, 2004, Shireen R. Damania, M.D., completed a consultative psychiatric evaluation of Plaintiff.  AR 195-198.  Plaintiff reported going to a job interview the day before the evaluation.  AR 196.  During the evaluation, Plaintiff told Dr. Damania that he has anxiety, bad dreams and wakes up with his heart pounding.  AR 196.  He also indicated that he forgets and gets mad easily.  AR 196.  On mental status examination, Plaintiff was mildly anxious and vaguely depressed.  AR 197.  His affect was broad and appropriate to thought content and

1    situation.  AR 197.  Dr. Damania diagnosed Plaintiff with adjustment disorder with anxious

2    mood, alcohol abuse in remission by history and polysubstance dependence in remission since

3    1995 by history.  AR 197.  Dr. Damania assigned Plaintiff a Global Assessment of Functioning

4    ("GAF") of 60.  AR 197.  Dr. Damania noted that Plaintiff had no difficulties in memory,

5    concentration, persistence and pace.  AR 198.  Dr. Damania opined that Plaintiff was able to

6    understand, carry out and remember simple and one- and two-step job instructions in an unskilled

7    setting.  AR 198.  He was able to respond appropriately to coworkers, supervisors and the public.

8    AR 198.  He also was able to respond appropriately to usual work situations and deal with

9    changes in a routine work setting with normal supervision.  AR 198.

10        On April 20, 2004, Dr. Sundaresan wrote a letter to Oleh Wolowodiuk, M.D., regarding

11   neurology evaluations of Plaintiff.  AR 254.  Dr. Sundaresan noted that Plaintiff did not keep

12   most of his appointments for follow-up, but that Plaintiff was examined on April 20, 2004.  AR

13   254.  Dr. Sundaresan indicated that Plaintiff had "a history of frequent falls, tendency for the legs

14   to give way, mainly his right leg with shooting pain from the hip to the middle of his leg."  AR

15   254.  Dr. Sundaresan gave Plaintiff a working diagnosis of Post Polio Syndrome, Lumbosacral

16   Stenosis with Radiculoneuropathy and Mononeuropathy Multiplex of the upper and lower

17   extremities.  AR 254.  Dr. Sundaresan requested a Myelogram with Cat Scan to assess Plaintiff's

18   tendency for his legs to give away.  AR 254.

19        On April 21, 2004, state agency physician Evelyn Aquino-Caro, M.D., completed a

20   Mental Residual Functional Capacity Assessment form.  AR 203-206.  Dr. Aquino-Caro opined

21   that Plaintiff had moderate limitations in the ability to understand and remember detailed

22   instructions and in the ability to carry out detailed instructions.  AR 203.

23        On April 21, 2004, Dr. Aquino-Caro also completed a Psychiatric Review Technique

24   form.  AR 207-220.  Dr. Aquino-Caro determined that Plaintiff had an adjustment disorder, a

25   medically determinable impairment that did not precisely satisfy the diagnostic criteria for an

26   affective disorder.  AR 210.  Plaintiff also had a history of polysubstance abuse that did not

27   precisely satisfy the criteria for substance addiction disorders.  AR 215.  Dr. Aquino-Caro opined

28   that Plaintiff had mild difficulties in maintaining social functioning and mild difficulties in

maintaining concentration, persistence or pace.  AR 217.  His restriction of activities of daily living were considered none to mild.  AR 217.  On November 8, 2004, Glenn Ikawa, M.D., reviewed and affirmed the assessment as written.  AR 207.

On May 6, 2004, Plaintiff sought treatment at Sierra Kings Family Health Center for complaints of lower back pain, right leg pain and depression.  AR 241-243.  Plaintiff was diagnosed with post polio myelitis syndrome, chronic lower back pain and depression.  AR 242.  His Paxil prescription was stopped and he was prescribed Vicodin and Fluoxetine.  AR 242.  He was referred to a podiatrist for a new shoe lift.  AR 242.

On July 29, 2004, Plaintiff sought treatment at Sierra Kings Family Health Center for complaints of daily palpitations and depression.  AR 240.  Plaintiff reported that his depression was beginning to worsen while on Fluoxetine and he requested Vicodin for lower back pain.  AR 239-240.  Plaintiff was diagnosed with palpitations, fatty liver, depression and chronic, recurrent lower back pain.  AR 240.  He was prescribed an increase in Fluoxetine and Vicodin was prescribed for his lower back pain.  AR 240.

On November 16, 2004, Plaintiff sought follow-up treatment at Sierra Kings Family Health Center for lab and Holter monitor results.  AR 236.  Plaintiff complained of depression and recent palpitations.  AR 236.  His Holter monitor was negative.  AR 236.

On April 22, 2005, Plaintiff sought treatment at Sierra Kings Family Health Center for right leg residual atrophy and weakness and depression.  AR 263.  On examination, Plaintiff had right lower extremity atrophy and increased right calf tightness.  AR 263.  Plaintiff was diagnosed with post polio myelitis muscle atrophy of the right lower extremity and depression.  AR 263.

On October 6, 2005, Plaintiff sought treatment at Sierra Kings Family Health Center for depression.  AR 262.  Plaintiff was diagnosed with depression and post-polio myelitis with atrophy and weakness in the left leg.  AR 262.  Plaintiff was to resume Fluoxetine.  AR 262.

On January 12, 2006, Plaintiff sought treatment at Sierra Kings Family Health Center for a follow-up on his leg.  AR 255.  Plaintiff reported that the neurologist wanted to do a Myelogram with CT, but Plaintiff was afraid of needles placed in his back and refused the test.

AR 255.  Plaintiff complained of recent episodes of falls because of right leg weakness and gradual left leg weakness.  AR 255.  Plaintiff also reported that 3-4 years ago he fell, cut his hand on glass, and needed a repair of the his flexor tendons in the right palm.  AR 255.  Plaintiff reported some limitation of strength and stamina with grasping, but had full range of motion.  AR 255.  On examination, Plaintiff had pronounced muscle atrophy in his right leg and atrophied patellar tendons in his left leg.  AR 255.  He was diagnosed with neuropathy (Post-Polio Syndrome), right hand weakness, metatarsalgia with right foot and muscle deformities and depression.  AR 255.  Plaintiff was referred to a podiatrist, his Fluoxetine was refilled and he was prescribed Ultram.  AR 255.  It was noted that forms had to be "filled out & signed by 'M.D.' Dr. Garcia."  AR 255.

On January 13, 2006, Fernando D. Garcia, M.D., completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) form.  AR 256-258.  Dr. Garcia opined that Plaintiff's lifting/carrying was affected by impairment and that Plaintiff could lift 15 pounds occasionally and could not lift any weight frequently.  AR 256.  Dr. Garcia indicated that the medical findings supporting this assessment were chronic low back pain, depression and right hand flexor tendon injury.  AR 256.  Dr. Garcia further opined that Plaintiff's standing/walking was affected by impairment and that Plaintiff could stand and/or walk 1 hour total in an 8-hour day and 10-15 minutes without interruption due to "pain lumbar area."  AR 256.  Dr. Garcia also opined that Plaintiff's sitting was affected by impairment and that Plaintiff could sit 3 hours total in an 8-hour day and 3 hours without interruption.  AR 257.  Dr. Garcia based that assessment on Plaintiff's "lumbar pain."  AR 257.  Dr. Garcia reported that Plaintiff could not climb, stoop, kneel, balance, crouch or crawl due to polio in his right leg and a left leg with disuse atrophy.  AR 257.   Dr. Garcia indicated that Plaintiff's reaching probably was affected by the impairment and his handling was affected because objects fall from his hand due to mild weakness in the right hand.  AR 257.  Plaintiff had environmental restrictions from vibrations because they create imbalance of weak lower extremities based on Plaintiff's atrophy of lower extremities and weakness of right arm/hand.  AR 258.

1    On January 27, 2006, Nurse Dueck of the Sierra Kings Family Health Center submitted a

2  letter regarding Plaintiff's appeal for disability claim.  AR 259.  Nurse Dueck indicated that

3  Plaintiff's childhood polio left him with weakened and atrophied right leg, with weakness and a

4  pronounced limp.  AR 259.  Nurse Dueck reported that Plaintiff had a "long history of falls at

5  work."  AR 259.  His leg became easily fatigued, triggering falls.  AR 259.  Nurse Dueck also

6  commented on Plaintiff's history of severed flexor tendons in his hand.  AR 259.  Nurse Dueck

7  reported that Plaintiff had near normal range of motion for his hand and fingers, but not a

8  complete return to motor strength for grasping.  AR 259.  Nurse Dueck also indicated that

9  Plaintiff's hand became fatigued easily resulting in difficulty handling objects without dropping

10  them.  AR 259.  In the past, Plaintiff had to take frequent breaks at work because of his weakness

11  and quickly fatigued muscles.  AR 259.  Nurse Dueck commented that Plaintiff had noticed a

12  worsening of his symptoms and an increase in the frequency of his falls.  AR 259.  Nurse Dueck

13  reported that Plaintiff's "functional impairments are quite obvious to anyone who looks at his

14  right leg and test his strength in that leg and his affected hand."  AR 259.

15    ALJ's Findings

16    The ALJ determined that Plaintiff met insured status requirements through the December

17  31, 2007.  AR 15.  The ALJ also determined that Plaintiff had not engaged in substantial gainful

18  activity at any time relevant to the decision.  AR 15.  The ALJ found that Plaintiff had the severe

19  impairments of post-poliomyelitis syndrome, small cervical disc bulges, lumbar plexopathy and

20  lower extremity mononeuropathy, adjustment disorder, alcohol abuse possibly in remission,

21  polysubstance abuse in remission by history and rule out bilateral plexopathy.  AR 15.  The ALJ

22  concluded that Plaintiff's impairments significantly limited his ability to engage in work-related

23  activities, but he did not have an impairment or combination of impairments that met or

24  medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

25  AR 15-16.  The ALJ further found that Plaintiff had the residual functional capacity to lift and

26  carry 70 pounds occasionally and 25 pounds frequently.  AR 16.  He could stand, walk and sit for

27  six hours each in an eight-hour workday.  AR 16.  He also could perform simple, repetitive tasks

28  and one-to-two step job instructions.  AR 16.  Therefore, the ALJ concluded that Plaintiff was

1  capable of performing his past relevant work as a machine packager and a weeder/thinner.  AR

2  21.  In the alternative, the ALJ determined that considering the claimant's age, education, work

3  experience and residual functional capacity, there were jobs that existed in significant numbers in

4  the national economy that Plaintiff could perform.  AR 21-22.  Therefore, the ALJ found that

5  Plaintiff was not under a "disability."  AR 22.

6  **SCOPE OF REVIEW**

7  Congress has provided a limited scope of judicial review of the Commissioner's decision

8  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9  the Court must determine whether the decision of the Commissioner is supported by substantial

10  evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla,

11  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*

12  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

13  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

14  (internal quotation marks and citation omitted).  The record as a whole must be considered,

15  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

16  conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and

17  making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v.*

18  *Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

19  determination that the claimant is not disabled if the Commissioner applied the correct legal

20  standards, and if the Commissioner's findings are supported by substantial evidence.  *See*

21  *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

22  **REVIEW**

23  In order to qualify for benefits, a claimant must establish that he is unable to engage in

24  substantial gainful activity due to a medically determinable physical or mental impairment which

25  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

26  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

27  such severity that he is not only unable to do his previous work, but cannot, considering his age,

28  education, and work experience, engage in any other kind of substantial gainful work which

1  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

2  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

3  Cir. 1990).

4          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

5  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

6  C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g) (2006).  Applying the evaluation process in this case,

7  the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity for the relevant

8  time period; (2) has an impairment or a combination of impairments that is considered "severe"

9  (post-poliomyelitis syndrome, small cervical disc bulges, lumbar plexopathy and lower extremity

10  mononeuropathy, adjustment disorder, alcohol abuse possibly in remission, polysubstance abuse

11  in remission by history and rule out bilateral plexopathy) based on the requirements in the

12  Regulations (20 C.F.R. § 416.920(c) (2006)); (3) does not have an impairment or combination of

13  impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of

14  Part 404; (4) is able to perform his past relevant work as a machine packager and a

15  weeder/thinner; or, in the alternative (5) there are jobs that exist in significant numbers in the

16  national economy that he can perform.  AR 15-22.

17          In this case, Plaintiff challenges the ALJ's determination and contends that there is no

18  substantial evidence to support the ALJ's finding that Plaintiff is not disabled.  Specifically,

19  Plaintiff argues that the ALJ (1) improperly evaluated Plaintiff's postpolio sequelae; (2)

20  improperly evaluated the physician opinions and assessments; and (3) improperly evaluated

21  Plaintiff's credibility.

22                                          **DISCUSSION**

23  A.      Substantial Evidence

24          1.      Evaluation of Plaintiff's Postpolio Sequelae

25          Plaintiff argues that the ALJ improperly evaluated his postpolio syndrome.  To support

26  his argument, Plaintiff first alleges that the ALJ utilized an improper standard by requiring that

27  the syndrome be "totally disabling."  Plaintiff's Opening Brief, p. 6.  Plaintiff urges that once an

28  impairment is determined to be severe, the impairment then must be evaluated to determine what

1   effect it has on a person's ability work.  *Id*.  Under the Social Security Act (the "Act"), define

2   "disability" is defined as the inability to engage in any substantial gainful activity ("SGA") by

3   reason of any medically determinable physical or mental impairment (or combination of

4   impairments) which can be expected to result in death or which has lasted or can be expected to

5   last a continuous period of not less than 12 months.  42 U.S.C. § 416(i)(1).  In this case, although

6   the ALJ stated in his decision that Plaintiff's "post polio syndrome is not severe enough to be

7   totally disabling," the ALJ also made related findings regarding Plaintiff's polio and his ability to

8   work.  Specifically, in assessing Plaintiff's residual functional capacity, the ALJ determined that

9   the "medical record did not contain any convincing evidence to show that the claimant's

10  condition had deteriorated to the point he is unable to work."  AR 21.  That the ALJ used the

11  phrase "totally disabling" does not indicate that he applied an incorrect standard in assessing

12  Plaintiff's postpolio syndrome.  *Cf. Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)

13  (affirming finding that claimant was physically impaired but not disabled where claimant's

14  doctors did not express the opinion that he was "totally disabled").

15          Next, Plaintiff contends that the ALJ failed to properly analyze his mental condition as

16  part of postpolio sequealae because the ALJ "denied the existence of a serious mental

17  impairment contrary to the opinion of Dr. Darmania [sic]."  Plaintiff's Opening Brief, p.7.  This

18  is not a situation, however, where the ALJ improperly discounted the opinion of the examining

19  psychiatrist, Dr. Damania.  Indeed, the ALJ gave "substantial weight" to Dr. Damania's opinion

20  and determined that Plaintiff's adjustment disorder was severe.  AR 15, 20.

21          Insofar as Plaintiff cites to Dr. Damania's assignment of a GAF of 60 to support his

22  contention that he has a serious mental disorder, there is nothing in the record to suggest that Dr.

23  Damania's functional assessment of Plaintiff's mental abilities did not include consideration of

24  Plaintiff's GAF score.  Dr. Damania diagnosed Plaintiff with adjustment disorder with Anxious

25  Mood and assigned Plaintiff a GAF of 60.  AR 197.  The GAF is measured on a scale of 0-100,

26  with a higher number associated with higher functioning.  A GAF score of 60 comports with

27  moderate difficulty in social, occupational or school functioning, such as few friends or conflicts

28  with peers or co-workers.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.

1    1994).  Dr. Damania did not opine, however, that Plaintiff's adjustment disorder limited his

2    mental ability to perform basic work or occupational activities.  Rather, Dr. Damania opined that

3    Plaintiff was able to understand, carry out and remember simple and one- and two-step job

4    instructions in an unskilled setting.  AR 198.  He was able to respond appropriately to coworkers,

5    supervisors and the public.  AR 198.  He also was able to respond appropriately to usual work

6    situations and deal with changes in a routine work setting with normal supervision.  AR 198.

7    Moreover, clinicians use a GAF to rate the psychological, social and occupational functioning of

8    a patient.  The scale does not evaluate impairments caused by psychological or environmental

9    factors.  *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).

10        To the extent that Plaintiff argues the ALJ should have found Plaintiff to have postpolio

11   sequelae, the mere existence of an impairment would not be sufficient proof of a disability.  *See*

12   *Sample v. Schweiker*, 694 F.2d 639, 642-643 (9th Cir. 1982).  "A claimant bears the burden of

13   proving that an impairment is disabling."  *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

14   In other words, the claimant must show that he is precluded from engaging in not only his

15   "previous work," but also from performing "any other kind of substantial gainful work" due to

16   such impairment.  42 U.S.C. § 423(d)(2)(A).

17        Plaintiff next argues that the ALJ failed to include all of Plaintiff's non-exertional

18   impairments associated with postpolio sequelae, including repetitive falling due to leg weakness

19   and pain, in a hypothetical to the VE, as required by SSR 03-1p.[2]  Plaintiff correctly states that

20   when a claimant suffers from multiple impairments, the Commissioner must consider their

21   combined effect without regard to whether any such impairment, if considered separately, would

22   be of sufficient medical severity, in determining whether the claimant is disabled.  *Gregory v.*

23   *Bowen*, 844 F.2d 664, 666 (9th Cir.1988); *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir.

24   1987).  This is true whether or not Plaintiff is considered to have postpolio sequelae.

25   "Hypothetical questions posed to the vocational expert must set out *all* the limitations and

26   restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).

27   _____

28        [2]SSR 03-1p provides guidance regarding the Development and Evaluation of Disability Claims Involving
     Postpolio Sequelae.

The testimony of a VE "is valuable only to the extent that it is supported by medical evidence." *Sample*, 694 F.2d at 644 (9th Cir. 1982).  The VE's opinion about a claimant's residual functional capacity has no evidentiary value if the assumptions in the hypothetical are not supported by the record. *Embrey*, 849 F.2d at 422.  Here, the ALJ adopted the hypothetical for which he found support in the record.  In connection with Plaintiff's orthopedic limitations, including standing and balancing, the ALJ gave "considerable weight" to opinion of Dr. Rush, a Diplomate of the Board of Internal Medicine.  AR 19.  Dr. Rush opined that Plaintiff had no specific orthopedic limitations.  AR 194.  The ALJ noted that this opinion was consistent with Plaintiff's return to work in 2004 and Plaintiff's activities of daily living.  AR 19.

With regard to Plaintiff's pain, the ALJ considered Plaintiff's subjective complaints, but found them "less than fully credible."  AR 20.  As the Commissioner correctly notes,  "[a]n ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted).  In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996).  Here, and as discussed in greater detail below, the ALJ rejected the Plaintiff's testimony by citing to specific inconsistencies in Plaintiff's testimony, referencing the range of Plaintiff's activities of daily living and his treatment record.  AR 20.

2.    Physician Opinions and Assessments

Plaintiff argues that the ALJ improperly evaluated the opinions of Nurse Dueck and Dr. Garcia.  As an initial matter, Plaintiff contends that he was treated for several years at Sierra Kings Family Health Center and "this medical center took a team approach to the treatment." Plaintiff's Opening Brief, p. 8.  Plaintiff's contention is unsupported.  The record is silent regarding the treatment approach utilized by Sierra Kings Family Health Center.

Plaintiff further contends that the ALJ's reasons for rejecting the treating source physician are insufficient.  It is true that the medical opinion of a claimant's treating physician is entitled to "special weight." *Embrey*, 849 F.2d at 421.  Reliance on the opinion of the treating physician is based not only on the fact that he is employed to cure but also on his greater opportunity to

observe and know the patient as an individual.  *Magallanes*, 881 F.2d at 751.  The Court now

turns to the medical opinions at issue.

a.   *Opinion of Melvin Dueck, F.N.P.*

Plaintiff argues that the ALJ incorrectly rejected the opinion of Nurse Dueck on the basis

that he was not an acceptable medical source.  Pursuant to the Regulations, "acceptable medical

sources" do not include nurse practitioners.  20 C.F.R. §§ 404.1513, 416.913 (2006).  Instead,

Nurse Dueck is considered to be an "other source" whose opinion the ALJ may give less weight

to than that of an acceptable medical source.  20 C.F.R. §§ 404.1513(d), 416.913(d); *Gomez v.*

*Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996).  Although there are exceptions to this rule, such as

when a treating physician adopts the opinion of an unacceptable medical source or when the

unacceptable source works closely with a physician, they are not applicable here.  *Polny v.*

*Bowen*, 864 F.2d 661, 662-664 (9th Cir. 1988); *Gomez*, 74 F.3d at 971.  Plaintiff's contention

that Nurse Dueck's opinion was rendered as part of an interdisciplinary team is unsupported.

There is no indication that an acceptable medical source adopted or affirmed Nurse Dueck's

August 2003 opinion or January 2006 opinion.  AR 176, 259.

Further, while the ALJ acknowledged that Nurse Dueck was not an acceptable medical

source pursuant to the regulations, that was not the sole reason for rejecting his opinions.  AR 17.

The ALJ gave "little weight" to Nurse Dueck's August 2003 opinion that Plaintiff's physical

limitations included no climbing ladders/stairs and no activities that required balancing, stooping,

crouching or kneeling, because Plaintiff had worked the previous month, had looked for work the

following month and had worked again in February 2004.  AR 17.  The ALJ also gave "little

weight" to Nurse Dueck's January 2006 opinion because it did not include "functional

limitations and [was] of no help in evaluating the claimant's functional capacity."  AR 19.

b.   *Opinion of Dr. Fernando Garcia*

In this case, the ALJ gave the opinion of Dr. Garcia "little weight" because the "fill-in-the

blanks, check-blocks form lacked bases for the conclusions regarding limitations, such as signs,

test results, whether the limitations were based on the clamant's subjective complaints or

objective findings or observation."  AR 18.  A brief and conclusionary form opinion which lacks

24

supporting clinical findings is a legitimate reason to reject a treating physician's conclusion. *Magallenes*, 881 F.2d at 751. Accordingly, the ALJ afforded greater weight to the opinion of Dr. Rush, an examining physician, over that of Dr. Garcia. AR 18, 19. The Court is mindful of the recent decision in *Orn v. Astrue* 495 F.3d 625 (9th Cir. 2007), where the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion of an examining physician over that of a treating physician. However, where the treating physician's opinion is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

In affording little weight to Dr. Garcia's opinion, the ALJ also noted that the Plaitniff was treated by a Nurse Practitioner and "the file contains no mention that Dr. Garcia ever saw the claimant." AR 18. Plaintiff challenges the ALJ's assessment of Dr. Garcia's opinion and argues that the ALJ's rejection of Dr. Garcia's opinion "ignored the interplay of Doctor/Nurse Practitioner in an interdisciplanary team setting." Plaintiff's Opening Brief, p. 10. This argument is without merit. There is no indication in the record that Dr. Garcia participated in an "interdisciplinary team setting," worked closely with Nurse Dueck or independently examined Plaintiff.

As acknowledged by the Plaintiff, the ALJ sought additional information from Dr. Garcia, including information about Dr. Garcia's specialty and qualifications, Plaintiff's specific limitations, how often and when Dr. Garcia saw the Plaintiff and whether Dr. Garcia was part of a treatment team. AR 18. Dr. Garcia did not submit a response to the ALJ. AR 18. Plaintiff argues that the ALJ discourgaed Dr. Garcia's response because the doctor was given an option not to respond and any response would be at the doctor's own expense. Plaintiff's Opening Brief, p. 10. Plaintiff's argument is speculative and without merit. There is no evidence demonstrating that Dr. Garcia did not respond because he was "discouraged" by the ALJ.

3.   Credibility

Plaintiff contends that the ALJ did not properly evaluate Plaintiff's credibility. The ALJ is required to make specific findings assessing the credibility of Plaintiff's subjective complaints. *Ceguerra v. Sec'y of Health & Human Serv.*, 933 F.2d 735, 738 (9th Cir. 1991). As noted above, in rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible

1    and what evidence undermines the claimant's complaints." *Lester,* 81 F.3d at 834.  Pursuant to

2    Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of his pain and

3    impairments is unreliable, the ALJ must make a credibility determination with findings

4    sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

5    claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

6         "The ALJ may consider at least the following factors when weighing the claimant's

7    credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

8    testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

9    record, and testimony from physicians and third parties concerning the nature, severity, and effect

10   of the symptoms of which [claimant] complains." *Id.* at 958-959 (citing *Light v. Soc. Sec.*

11   *Admin.,* 119 F.3d 789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by

12   substantial evidence in the record, we may not engage in second-guessing." *Id.* at 959.

13        Here, the ALJ made specific findings in assessing Plaintiff's credibility.  First, the ALJ

14   indicated that Plaintiff's testimony was inconsistent on several points.  The ALJ cited Plaintiff's

15   inconsistent hearing testimony regarding driving, wherein Plaintiff first testified that he did not

16   drive any more and then subsequently testified that he drove his children to school every day and

17   picked them up.  AR 20, 285, 290-291.  The ALJ also commented on Plaintiff's inconsistent

18   testimony about when he last looked for work.  AR 20.  Plaintiff contends that the ALJ nitpicked

19   to find such inconsistencies.  As noted above, however, an ALJ may consider inconsistencies in a

20   claimant's testimony when weighing credibility.  *Id*. at 958.

21        Additionally, the ALJ considered Plaintiff's activities of daily living when assessing

22   Plaintiff's credibility.  The ALJ noted that Plaintiff cares for his children while his wife works,

23   shops daily, cooks simple meals, vacuums, takes the trash out, makes the bed, does laundry,

24   transports children and spends four hours per week in church.  AR 20.  An ALJ may consider a

25   claimant's daily activities when weighing credibility.  *Thomas*, 278 F.3d at 959 (9th Cir. 2002);

26   *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (claimant's daily activities, which

27   included attending to the needs of two young children, cooking, housekeeping, laundry, shopping

28   and attending therapy and meetings undermined disability claim).  Plaintiff's argument that his

1 | mother helps about 50% percent does not undermine the ALJ's determination, since the Plaintiff
2 | arguably completes those activities the other 50% of the time.

3 |      Plaintiff further challenges the ALJ's determination that Plaintiff had the ability to
4 | concentrate during the one hour hearing.  Although Plaintiff generally refers the Court to the
5 | hearing transcript, he does not provide specific citations demonstrating Plaintiff's difficulties
6 | with concentration and memory.  Moreover, the record reveals that the consultative examiner,
7 | Dr. Damania, found that Plaintiff had no difficulties in memory, concentration, persistence and
8 | pace.  AR 198.

9 | **RECOMMENDATION**

10 |      Based on the foregoing, the Court finds that the ALJ's decision is supported by
11 | substantial evidence in the record as a whole and is based on proper legal standards.
12 | Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision
13 | of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for
14 | Defendant Michael J. Astrue and against Plaintiff Miguel Estrada.

15 |      These findings and recommendations will be submitted to the Honorable Lawrence J.
16 | O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after
17 | being served with these findings and recommendations, the parties may file written objections
18 | with the court.  The document should be captioned "Objections to Magistrate Judge's Findings
19 | and Recommendations."  The parties are advised that failure to file objections within the
20 | specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d
21 | 1153 (9th Cir. 1991).

22 |

23 |   IT IS SO ORDERED.

24 | **Dated:**   **November 19, 2007**          **/s/ Gary S. Austin**
25 | UNITED STATES MAGISTRATE JUDGE